## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ARSENAL INTERMEDIATE HOLDINGS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11 (Subchapter V)<br><br>Case No.  23-10097 (CTG)<br><br>(Jointly Administered) |
| WILLIAM A. HOMONY, in his capacity as Trustee for the Arsenal Liquidating Trust,<br><br>Plaintiff,<br><br>v.<br><br>NORMAN CHANDLER and JUSTIN LAW,<br><br>Defendants. | Adv. No. _____<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT</u>

### I.   <u>INTRODUCTION</u>

1.     William A. Homony, Liquidating Trustee (the "**Plaintiff**" or "**Liquidating Trustee**") for the Arsenal Liquidating Trust for Debtors Arsenal Intermediate Holdings, LLC, Arsenal Insurance Management, LLC and Arsenal Health, LLC ("**Arsenal**," the "**Company**," or "**Debtors**"), by and through his counsel, brings this action to recover damages caused by the breaches of fiduciary duty and other wrongdoing of Debtors' former directors and managers – Defendants Norman Chandler ("**Chandler**") and Justin Law ("**Law**") (collectively "**Defendants**").

---

[1]     The Debtors are Arsenal Intermediate Holdings, LLC (2513), Arsenal Insurance Management, LLC (3990) and Arsenal Health, LLC (5247).

2.    Before its collapse, Arsenal's core business was managing captive insurance companies and administering self-funded group medical and other health benefit plans on behalf of its clients.  Arsenal's revenue derived from fees charged for: (i) administering self-funded health benefit plans set up on behalf of plan sponsors (*i.e.*, employers), (ii) managing and administering enterprise risk pools, (iii) managing a mutual captive insurance company, Iron Reinsurance Company, Inc. ("**Iron Re**"), that provides stop-loss insurance for the health plans; and (iv) captive management services.   Arsenal was subject to contractual obligations to clients, as well as fiduciary and other regulatory obligations under ERISA and other laws.

3.    With Defendants' knowledge and under their direction and control, Arsenal systematically: (a) misled clients regarding the nature of its health plan offerings, obscuring the fact that clients' financial responsibility could (and in many instances did) exceed their monthly contributions; (b) underpriced health plans to lure and retain clients—thereby creating underfunded health plans which jeopardized the payment of benefits to plan participants and placed the Company at risk; and (c) failed to comply with its contractual arrangements, fiduciary responsibilities, and ERISA obligations, by, among other things, failing to make required filings with the U.S. Department of Labor ("**DOL**") on behalf of the plans, filing inaccurate forms, failing to conduct required plan audits, engaging in prohibited transactions on behalf of ERISA plans with related parties (including accounting firms and service providers in which Chandler and/or related individuals had an ownership interest) and exposing Arsenal to liability under ERISA in connection with such prohibited transactions;[2] and (d) breached its obligations to Iron Re, health

---

[2]    Although the Liquidating Trustee is seeking certain damages arising out of ERISA violations, he is not making an ERISA claim.

plans and plan sponsors by failing to keep accurate books and records and causing plans to be underfunded.

4.      As one example of fraudulent business practices that played an instrumental role in Arsenal's demise, Arsenal falsely marketed its health plans and tricked plan sponsors into believing that their healthcare expenditures were capped, when in fact they remained liable for costs and expenses that exceeded their monthly contributions, up to the full amount of the self-insured layer. In this regard, Arsenal included misleading provisions in marketing materials supplied to brokers, plan sponsors, and plan participants, caused Iron Re to pay deficits incurred by client plans that amassed claims and expenses in excess of their contributions, failed to recoup those deficit payments from the client plans and plan sponsors on Iron Re's behalf, and concealed the improper funding scheme from Arsenal's clients.

5.      In December 2021—as part of a scheme to enrich themselves at the expense of the Company and its creditors—Defendants orchestrated a sale of Arsenal at consideration inflated by fraudulent misrepresentations as to the Company's operational and financial condition—a transaction which resulted in Defendants being hired by the new owner to continue in their roles as officers and managers of Arsenal.

6.      After the sale, Defendants continued to operate the business in the same unlawful manner—wrongdoing which deepened the Company's insolvency, destroyed the business, left creditors owed more than $7.5 million and necessitated Arsenal's bankruptcy filing in January 2023.

## II.      **JURISDICTION & VENUE**

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "**Bankruptcy Code**"), or in or related to cases under the Bankruptcy Code.

8.     The Liquidating Trustee demands a jury trial before an Article III judge in connection with all claims to which he is entitled to a jury trial under the Constitution and applicable law, and the Trustee does <u>not</u> consent to the entry of final judgment or adjudication by a bankruptcy judge as to jury-triable claims.

9.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

10.     Defendants have subjected themselves to the jurisdiction of this Court by filing Proofs of Claim in the Bankruptcy Proceeding and this Court expressly retained jurisdiction over all claims by Debtors against Defendants in its Confirmation Order (defined below).

## III.    <u>PARTIES</u>

### A.    **Plaintiff**

11.     On January 26, 2023 (the "**Petition Date**"), Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, and the cases were jointly administered under the caption *In re Arsenal Intermediate Holding, LLC, et al.*, U.S.B.C. D. Del. Case No. 23-10097 (CTG).

12.     On May 23, 2023 (the "Confirmation Date"), the Court entered an order [Docket No. 292] (the "**Confirmation Order**") confirming the *Amended Joint Chapter 11 Plan of Liquidation of Arsenal Intermediate Holdings, LLC and its Affiliated Debtors* attached as <u>Exhibit A</u> to the Confirmation Order (together with all exhibits thereto, and as may be amended, modified or supplemented, the "**Plan**").[3]

---

[3]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

13.     On May 31, 2023, the Plan became effective, the Liquidating Trust was established and Plaintiff was appointed as Liquidating Trustee.

14.     As set forth in the Plan, all Retained Causes of Action (including all claims and causes of action against the Defendants) have been vested in the Liquidating Trust and the Liquidating Trustee has the exclusive authority prosecute, compromise, and settle all Retained Causes of Action.

15.     Debtor AIH is a limited liability company organized under the laws of Delaware. Debtor AIH is a holding company.

16.     Debtor AIM is a limited liability company organized under the laws of Alabama. AIM was an operating entity that assisted with the formation and management of captive insurance companies (primarily in the single-parent captive end market) for property and casualty risks, as well as risk retention groups, and managing risk pools.

17.     Debtor AH is a limited liability company organized under the laws of Alabama. AH was an operating entity that administered or arranged for the administration of self-funded employee benefits programs for its health plan sponsor customers.

18.     Debtors AIM and AH wholly owned subsidiaries of Debtor AIH.

**B.     Defendants**

19.     Defendant Norman Chandler is the founder and former owner and Chief Executive Officer of AIM and AH. He was terminated from his position as CEO of AIM and AH on or about October 18, 2022.

- 5 -

20.     Defendant Justin Law is the former Chief Operating Officer of AIM and AH. He was terminated from his position as COO of AIM and AH on or about October 18, 2022.

## IV.    FACTS

### A.    Summary of Arsenal's Business and Industry

21.     AIM was founded in May 2006, and AH was founded in September 2018, by Chandler and two business partners.  By 2021, Chandler was the sole owner of both entities.

22.      In 2018, Arsenal began enrolling clients (also known as plan sponsors) and creating and operating health plans on their behalf.  Arsenal's clients consisted primarily of small and medium-sized businesses.

23.     Arsenal's product offering to employers consisted of self-funded healthcare benefit plans.  Traditional self-funded plans, such as the ones administered by Arsenal, typically operate as follows:

   a.     Each plan is funded through monthly contributions from plan sponsors, on behalf of plan participants—the plan sponsor's employees and their families;

   b.     The plan is responsible for paying each participant's claims up to a certain annual threshold (often called the "self-funded layer").  With Arsenal's plans, that threshold was typically $10,000 per participant—*i.e.*, the plans administered by Arsenal were responsible for paying medical claims up to that amount for each participant on an annual basis;

   c.     Plan sponsors contract for specific medical stop-loss insurance coverage with an insurer, which, in Arsenal's case, is responsible for claims above $10,000 per participant.  For Arsenal's clients, the stop-loss provider was Iron Re, a captive insurance company managed by Arsenal; and

   d.     All plan participants' claims within the $0–10,000 layer remain the responsibility of the plan, and if the sum of those claims and expenses exceeds the sum of monthly contributions intended to cover that layer of claims, the plan sponsor (*i.e.*, the employer) is responsible for funding that deficit.

24.     This structure was consistent with the definition of a traditional self-funded plan generally accepted among market participants.

25.     Employers sponsoring self-funded plans typically contract with a third-party administrator or insurer to provide administrative services for the self-funded plan. In some cases, the employer may buy stop-loss coverage from an insurer to protect the employer against very large claims.

26.     The sponsor of a traditional self-funded plan is exposed not just to the risk of individual plan participants unexpectedly incurring very large claims, but the sponsor is also exposed to the risk of accumulating an unexpectedly high aggregate volume and/or value of claims in the self-funded layer on a plan-wide basis.

27.     To mitigate this risk, another funding option, often called level-funding, has been made available to smaller employers.  Level-funded arrangements are nominally self-funded options that package together a self-funded plan with extensive stop-loss coverage that significantly reduces the risk retained by the sponsor.

28.     This is what Arsenal, at Defendants' direction, misled brokers and prospective and renewing clients to believe they were signing up for and paying Arsenal to administer—level-funded health benefit plans.

29.     As the DOL has explained, level-funded plans "blend elements of fully-insured and self-funded plans. With 'level-funded' plans, sponsoring employers . . . obtain two forms of stop-loss insurance policies: (1) specific coverage; and (2) aggregate coverage. Specific coverage insures claims for a covered individual once that individual's claim accruals exceed a specific value outlined in the stop-loss agreement, known as the 'attachment point.'  Aggregate coverage insures coverage

of all claims once the employer's claims total has reached an aggregate attachment point specified in the stop-loss agreement."

30. A level-funded plan combines payment in a fixed amount for administrative fees, projected claims expense, and both specific and aggregate stop- loss premium payments, generally at a higher cost to the plan sponsor. As such, despite being "nominally self-funded" and retaining responsibility for "funding all claims that do not meet . . . the specific . . . attachment point[]," a level-funded plan differs in a crucial respect: the sponsor's maximum annual exposure is preset on a plan-wide basis and capped at that amount.

31. This important difference between selecting a self-funded plan and a level-funded plan is widely understood in the insurance industry.

32. The same distinction between traditional self-funded plans and level- funded plans has serious implications for the client plan, its sponsor, Iron Re, and Arsenal.

33. An employer intending to sponsor a level-funded plan would expect to be able to determine maximum healthcare expenses in advance and budget accordingly, while knowing there would be no unexpected additional charges after the fact. Conversely, an employer intending to sponsor—and to have Arsenal administer— a self-funded plan would have to recognize the unpredictability of healthcare costs, budget for the possibility of increased expenses, and prepare for possible additional expenses after year's end.

34. As the carrier of specific, per-participant stop-loss coverage for self- funded plans, Iron Re must maintain reserve funds in case plan participants accumulate total claims in excess of their aggregate contributions. Accordingly, Iron Re relied on Arsenal to track each client plan's contributions-to-claims (plus expenses) ratio, as well as Iron Re's working capital surplus or deficit.

In addition, Iron Re's ability to advance funds and pay claims incurred in the self-funded layer by underfunded client plans, as needed to maintain those participants' uninterrupted access to medical care, was contingent on Arsenal collecting reimbursements from plan sponsors on Iron Re's behalf.

35.     For Arsenal, administering self-funded plans should entail ensuring, at the outset, that the plan sponsor understands and is prepared for the possibility of after-the-fact charges in the event that the sum of the self-funded portions of its claims and expenses exceeds total contributions in the self-funded layer, regularly tracking and promptly apprising the employer of any overages, and arranging collection of the deficits or establishing a repayment schedule on terms suitable for both the client, plan sponsor and Iron Re.

36.     Arsenal's core operations were subject to a series of contracts: (i) an Administrative Services Agreement between each plan sponsor and Arsenal Health containing the terms on which Arsenal would administer the client plan; (ii) a Medical Benefits Stop Loss Policy ("**Stop Loss Policy**") issued to the plan sponsor by Iron Re containing the terms of the specific (but not aggregate) stop-loss coverage, and (iii) the "Service Provider Agreement" between Iron Re and AIM containing the terms on which AIM should have operated and managed Iron Re.

37.     These contracts also accounted for a significant portion of Arsenal's revenue streams: pursuant to each Administrative Services Agreement, Arsenal was entitled to collect a monthly fee per employee; and pursuant to the Service Provider Agreement, Arsenal was entitled to receive an annual fee from Iron Re, as a percentage of total premiums underwritten by Iron Re.

B.      **Arsenal's Operations and Finances Were Materially and Negatively Impacted by Defendants' Wrongful Conduct**

i.      **Defendants Knowingly Utilized Misleading Marketing Materials**

38.     Arsenal falsely marketed its health insurance product primarily to brokers, who were responsible for bringing in approximately 95% of Arsenal's customers and business.

39.     Under Defendants' direction and control, Arsenal's product had been sold to brokers (and, accordingly, to prospective and renewing clients) as level-funded plans.

40.     Brokers who worked with Arsenal would receive a packet of documents including Arsenal's Broker Reference Guide.

41.     The Broker Reference Guide described Arsenal as a provider of "benefit programs" that "allow members to stabilize health benefit costs by providing a unique, specialized, level-funded program tailored to small and mid-sized businesses."  The guide misled clients, some of whom terminated or declined to renew their plans while expressing concerns at having been misled.

42.     This false marketing practice misled Arsenal's clients to expect that no further funding or payments would be required beyond their monthly contributions.

43.     Defendants had long known that Arsenal's product was being mis-marketed to brokers and clients as level-funded, knew that it was misleading, and did nothing to stop the misrepresentations.

44.     In August 2019, Chandler extensively edited the Broker Reference Guide, including the same page that wrongly touts the company's "unique, specialized, level- funded program"—but left this false statement uncorrected.

45.     Over the ensuing years, Defendants were reminded that Arsenal's sales efforts involved falsely marketing its product as level-funded.

46.     Nevertheless, Defendants allowed the misleading marketing to continue.

47.     Defendants' longstanding practice of misleading brokers and customers was in contravention of applicable laws and created significant exposure for the Company.

      **ii.     Defendants Implemented and Permitted Widespread and Significant Underpricing of Monthly Contributions and a Longstanding Failure to Collect Deficits**

48.     Defendants severely mismanaged Arsenal's underwriting process resulting in the Company breaching contractual and other duties to customers, thereby creating significant exposure and material risks for the Company.

49.     Defendants' mismanagement of Arsenal pricing strategy is evidenced by the high proportion of Arsenal's clients with excessive claims and expenses in the self-funded layer, while the deep flaws in Arsenal's process for recouping those excessive claims and expenses show how Defendants mismanaged its stop-loss coverage provider, Iron Re.

50.     Defendants knew that Arsenal's mismanagement and defective underwriting of client plans had consistently resulted in higher claims and expenses than contributions in the aggregate.

51.     In an August 2021 email to Law and others, Chandler admitted that Arsenal's failure to notify deficient plans of their contractual duty to make up those deficits was a problem.

52.     Further, Defendants knew that the deficits were attributable in part to the fact that Arsenal had engaged in widespread and significant underpricing of the self-funded plans that it offered and administered.

53.     In the same August 2021 email, Chandler acknowledged that almost all the major client plans that Arsenal added in the second half of 2020 were underpriced by over 20%. These

plans accounted for 35% of Arsenal's business. Thus, over a third of Arsenal's business was loss-generating.

54.     By September 2021, Defendants had allowed the client plans administered by the Company to accumulate an 86.4% loss ratio since inception.

55.     Through Arsenal's defective pricing strategy and mismanagement of Iron Re and client plans, Defendants endangered the Company's clients' ability to maintain stop-loss coverage, caused Arsenal to operate in breach of contractual and fiduciary duties, and exposed it to substantial liability.

### iii.     Defendants Operated and Oversaw Arsenal In a Manner that was Not Compliant with Federal and State Regulatory Requirements

56.     As a company operating in the highly regulated employee benefit plan and captive insurance sphere, Arsenal's actions were subject to heightened scrutiny from state and federal regulators.

57.     Under Defendants' direction and control, Arsenal habitually violated applicable federal and state regulatory requirements, by, among other things, failing to properly and timely file Form 5500s on behalf of the Multiple Employer Welfare Arrangement ("MEWA") and other client plans, failing to timely and properly provide accurate Summary Plan Descriptions ("SPD") to each participant of the client plans administered by Arsenal, failing to obtain actuarial opinions for the MEWA— which rendered false the representations made in the Form M-1s Arsenal filed with the DOL—and violating ERISA's fiduciary standards and prohibitions on engaging in interested-party transactions.

58.     In 2021, the Alabama State Department of Insurance asked Arsenal to respond to assertions made by one of its former employees about issues she claimed to have witnessed during

her employment, including the failure to satisfy regulatory requirements, make timely filings, and obtain appropriate approvals. In a draft response that he shared with Law on May 3, 2021, Chandler admitted that Arsenal had failed to meet regulatory requirements.

59.     Throughout 2021, Defendants caused Arsenal to use an SPD that did not explain that Arsenal would administer a "self-funded employee benefit plan" on behalf of each client and contained other inaccuracies and misstatements—reflecting further non-compliance with applicable laws and regulations.

60.     Further, Arsenal's engagement of various related companies—such as MGM Administrators LLC, Southern Standard Risk Management Group, and TaylorChandler, all of which shared significantly overlapping ownership with Arsenal at relevant times—to provide services to the MEWA and other client plans violated both contractual obligations and relevant regulations.  As a fiduciary to the MEWA and other client plans under the respective Administrative Services Agreement and under ERISA, Arsenal was prohibited from transacting with affiliated parties to the extent doing so involved transactions with "parties in interest" or "fiduciary self-dealing transactions" pursuant to Section 406(a) of ERISA if such transactions were not exempt under Section 408.

61.     Thus, Defendants' mismanagement of Arsenal resulted in a myriad of regulatory problems and exposed Arsenal to substantial fines.

62.     In fact, the DOL's investigation into these issues continues as to whether any further violations of ERISA have occurred, including whether "the Debtors violated ERISA by failing to pay health claims for services rendered to participants of the Plans, and by engaging and knowingly participating in prohibited transactions under ERISA."

63.     The DOL has filed a Proof of Claim in the Bankruptcy Proceeding in "the amount $4,560,522.45 owed to the Plans caused by the Debtors' failure to pay claims for services to participants of the Plans, and for other violations of ERISA."

64.     The clients for which Debtors failed to pay claims included: ABE SMITH INC., Above & Beyond Residential Cleaning Service, Inc., Adams Construction and Associates, Inc, AIR NOW, INC., AIRSHIP, ALABAMA EAR SPECIALISTS, Alabama Machinery & Supply Company, Inc., ALABAMA PROFESSIONAL SERVICES, ALABAMA RURAL COALITION FOR THE HOMELESS (ARCH), Alabama's Southern Market, LLC, ALDA (MEWA), Aldrich Publishing, LLC, All Access Overhead Door, LLC, ALPHA ACME ELECTRIC, INC, APPLIANCE CONNECTION, APT RESEARCH, APT RESEARCH 1, ARSENAL INSURANCE MANAGEMENT, ASSOCIATED INSURANCE ADMINISTRATION, INC, AUTOMATION SOLUTIONS INC., B.L.S. RESTAURANT, BARRON FAN TECHNOLOGY, INC, Bay Area Waste Solutions, BELL CO, INC., BEST GLASS COMPANY, INC., Billy's Paint & Body, BJB Auto LLC, BLACK MARKET BAR, Black River Investment Company, Bluewater Exteriors LLC, Bowden Oil Company Inc., Bowling Family Medical Clinic, BRYAN L PARKER CPA LLC, BUILD UP, CAHABA BREWING COMPANY, CALIBRATED SPEED AND PERFORMANCE LLC, Capstone Kids Pediatric Dentistry, Cassady and Self, CHAMBERS BOTTLING, CHEMWORX, LLC, CITY OF FAIRFIELD, Coastal Woodland, LLC, COHENS ELECTRONICS & APPLIANCES, INC., CRAFT ELECTRIC CO, INC, CREATIVE SECURITY SYSTEMS INC, CREATURE, LLC, Cross Roads Church of God, DARDEN GREEN COMPANY, INC., Deep South Decorative Concrete, DEFT DYNAMICS, Duncan Custom Gutter, Inc., EAGLE SOLAR & LIGHT, East Lake Academy dba Banks Academy,

EatMyBeats, Inc., Edsco Fasteners, Inc, EGM, LLC, Elm Services LLC, Emery Wings LLC DBA
Coop DeVille, English Dental, E-Worc, LLC, EXCLUSIVE AUTO WHOLESALE, FIREROCK
PRODUCTS LLC, Fleet Source LLC, FLOWERS INSURANCE AGENCY LLC, FRONTLINE
CARRIERS LLC, GEAUX ROUTE PARTNERS, GLS SUPPLY, LLC, GOAT ISLAND CRAFT
BREWING, LLC, GORRIE-REGAN, Greenway Plants Inc, Grounds Guys of Huntsville, GULF
COAST BUILDING SUPPLY, GULF COAST CONTAINERS, GULF HAULING &
CONSTRUCTION, INC., HagerCo LLC, HHH SANITATION, INC, Hoagland LLC dba Safe
Dry Clean, HOLLEY-HENLEY BUILDERS, INC, HTC, LLC, HUNTER TREES, LLC, Impact
Recovery Center, LLC, INDURON COATINGS, LLC, INVERNESS APOTHECARY TRINITY,
Iron City Church, ITF, LLC, JAUREGUI & LINDSEY, Jimmy and Darreus Transportation LLC,
JOE PIPER INC, JOHNSON INVESTMENTS DBA MR APPLIANCE, Jordan Pizza Inc.,
Kabasag, Inc. dba The Garage, Kristopher A. Portacci, DDS, PC, KURT'S TRUCK & PARTS
COMPANY, Lake Martin Dock Company, Laser Laminations, Inc, Leonard Design PC., LEWIS
BAMBOO INC, Lindsey & Waldo LLC, LIQUID AUTOMATION SOLUTIONS, Loped
DeJonge dba Rojo, LOWERY MANUFACTURING INC, Lowndes Academy, M & J STEEL,
LLC, MAAS AVIATION BROOKLEY INC, MATEX HOSE, Maurin Architecture, McKinney
Capital, MCM VENDING LLC, Met-tech Machining, Inc., Millhouse Landscaping LLC, MOVE
& STORE, LLC, MR T'S AUTO SERVICE, INC, Murfee Meadows , Inc.., National 3PL,
NATURESCAPE, INC, Nexus Fitness, Nicholas Peters Inc., NORTHPORT FUNERAL &
CREMATION SERVICE, Nothing But Lifts, O. Jay Fence Company, OLCOTT REAL ESTATE
LLC, Ox Digital Marketing, Parade Home Builders, Inc, Pate Landscape Co., Inc., Pat's Industrial
& Auto Supply, Inc, Paul Davis Restoration of Greater Birmingham, Paws & Claws, LLC,

PEARLY WHITE DENTISTRY, PECO FOODS (AR), PECO FOODS (MS), PEDIATRIC & ADOLESCENT DENTISTRY, PICKENS ACADEMY, PINNACLE IMPORTS, Professor Plumb LLC, PROGRESSIVE ELECTRIC DESIGN LLC, PURSUIT ENGINEERING, INC., RA-DON LLC, RCA TRUCKING, RESIDENT SUPPORT SERVICES, LLC, RETTIG AUTO BODY, RIVIERA DENTAL CARE, PC, ROCK N ROLL SUSHI, SAFESPRAY PEST CONTROL, SAFETY PLUS, INC., Selikoff Center Inc, Service Tech, Inc, SHAW FARMS, Shield Asphalt, Slice, LLC, Smith Lake Landscaping, SOUTHERN EDGE CONNECT, SOUTHERN ELECTRICAL CONTRACTORS, INC., SOUTHERN FOOD SERVICE MANAGEMENT, INC, SOUTHERN SKY AVIATION, LLC, SOUTHERN WOODSMITH, INC., Southlake Pediatrics, Spencer Management Group Inc. dba Image Arts, Stanley Steemer, STARBOARD MANAGEMENT, LLC, STARR INSURANCE GROUP LLC, Stonehedge Nursery, STREET METRICS, INC., STROUT ARCHITECTURE, LLC, SWAG Home Staging & Design, TALLADEGA FOUNDRY, Tarpon Mayca Investments, LLC, TAYLOR CHANDLER, LLC, TELEGRAPH CREATIVE, THE BACKYARD EXPERIENCE, INC., The Bright Star Restaurant, Inc., The Mackey Group, The Martin Service Company, The Rinehart Agency LLC, THE TRNT GROUP, Tiburon Communications, LLC, Tree Professional Inc., TRIDENT MARINA, LLC, TRI-FAB STEEL INC, TRISTATE COLLISION - BERRY TRANSPORTATION, TURNER FENCE, LLC, United Building Supply, Urban Hope Community Church, Veritas, VINSON PLUMBING & ELECTRIC, INC., WEAGLE INC, Weather Seal Windows and Doors INC, Wellness Medical Center, Welon Partners, Williams Ryan LLC, and WILLIAMSON INDUSTRIES, INC, YTY, LLC dba ISU Insurance Planning Services.

     **iv.**     **Defendants Concealed Material Operational Issues from the Buyer and Lined their Pockets in a Sale While Arsenal's Insolvency Deepened**

65.     In 2021, Chandler and another entity that he owned (the "**Sellers**") sought to divest AIM and AH.

66.     In June 2021, Beyond Risk Topco Holdings, L.P. ("**Topco**") and BR Intermediate Holdings, LLC ("**Purchaser**" and, together with Topco, "**Beyond Risk**") were introduced to Defendants with an eye toward a potential acquisition of AIM and AH (the "**Acquisition**").

67.     In a Unit Purchase Agreement dated December 23, 2021 (the "**Purchase Agreement**" or "**UPA**"), which governed the terms of the Acquisition, Sellers made numerous representations concerning Arsenal's compliance with its contractual and regulatory obligations. Among other things, Sellers represented that: (a) Arsenal was not in breach of any of its Material Contracts; (b) Arsenal, and the marketing material it used with potential clients, complied in all material respects with applicable law; (c) Arsenal had not taken action that could give rise to liability for fraud, insufficient pricing, or mischarging; (d) Arsenal appropriately segregated and did not commingle premiums received from its clients; (e) Arsenal had caused all services provided on behalf of client plans to comply with the terms of the plans and Arsenal's service agreements; (f) Arsenal had not engaged in any prohibited transaction under ERISA; and (g) no conditions existed that would cause any client plan benefit obligation to fail to be covered by a stop-loss insurance policy.

68.     As Defendants knew at the time, those representations were false.  In fact, Arsenal had systematically: (a) misled its clients regarding the nature of its health plan offerings, obscuring the fact that clients' financial responsibility could (and in many instances did) exceed their monthly contributions; (b) underpriced the health plans; and (c) failed to comply with its contractual

arrangements, fiduciary responsibilities, and ERISA obligations.  Arsenal's failings led to the significant underfunding of the client plans and jeopardized the payment of benefits to plan participants.  Showing their consciousness of guilt, Defendants undertook affirmative steps to hide the truth from Beyond Risk, misrepresenting Arsenal as a viable, ongoing business with potential for growth even though it was on the verge of ruin.

69.     Relying on the Sellers misrepresentation, Beyond Risk paid the Sellers a purchase price of $43 million for AIM and AH (from which Defendants received significant financial benefits).

70.     Upon discovering Defendants' malfeasance, Beyond Risk terminated their employment in October of 2022 and later commenced litigation in Delaware state court against Defendants raising claims based on fraud and contractual indemnification under the UPA.

## v.     Defendants' Conduct Destroys the Business and Arsenal is Forced into Bankruptcy

71.     Even with Defendants out of the picture, the Company could not recover as Defendants' conduct had a deep and devasting impact on Arsenal's business.

72.     Due to their mismanagement of the business, Arsenal steadily lost customers and revenue.

73.     From January 2022 through December 2022, Arsenal's monthly revenue declined from approximately $474,000 to approximately $74,000.

74.     Over the same period, Arsenal lost 95% of its customers.

75.     Without revenue to support its staff, Arsenal had no choice but to terminate sixty-two percent of their employees.

76.     The business was not profitable for more than a year.

77.     Given Arsenal's deteriorating financial and cash position, a bankruptcy process was necessary.

78.     In December of 2022, Arsenal appointed a Chief Restructuring Officer.

79.     On January 26, 2023, each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code, and the Trustee was appointed.

80.     On or about May 23, 2023, this Court entered the Confirmation Order. *See* Confirmation Order at ¶¶ 8.4; 11.96.

81.     The Confirmation Order provides that the "Bankruptcy Court shall retain exclusive jurisdiction of these Chapter 11 Cases," including "[a]ll Causes of Action not sold pursuant to the Sale(s) or released under the Plan . . .  For the avoidance of doubt, Retained Causes of Action include any and all claims that the Debtors may possess against Norman Chandler, Justin Law . . ." *See id.*

## V.     CLAIMS

### COUNT ONE - BREACH OF FIDUCIARY DUTY

82.     Paragraphs 1 through 81 above are incorporated herein by reference, as if restated in their entirety.

83.     By virtue of their role as officers and managers of Debtors, Defendants owed fiduciary duties to Debtors and their creditors.

84.     To discharge their fiduciary duties, each Defendant was required, *inter alia*: (a) to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of Debtors; (b) to be and remain informed as to how Debtors were operating and, upon receiving notice or information of an imprudent, questionable, or unsound business decision, condition, or practice, make reasonable inquiry and, if necessary, take all reasonable remedial

efforts; and (c) ensure that Debtors were operating in a sound manner and in compliance with all applicable laws and regulations, industry standards, and other guidelines.

85.     By failing to do so, each Defendant breached his fiduciary duties.

86.     Defendants:

a.      Failed to ensure that Debtors did not engage in misleading marketing practices;

b.      Failed to ensure that the Debtors correctly priced their products and set reasonable prices for monthly contributions;

c.      Failed to ensure that Debtors and Iron Re collected the deficits;

d.      Failed to ensure that Debtors complied with federal and state regulations and the law;

e.      Failed to ensure Debtors provided accurate information during the due diligence process;

f.      Caused the Debtors to lose customers and become financially unviable;

g.      Caused the Debtors to come under investigation by regulatory authorities for violations of the law;

h.      Caused Debtor to incur liabilities in excess of $4.5 million for failure to pay plan participant medical claims for services and other violations of ERISA; and

i.      Through their rampant wrongdoing, used Debtors to derive personal financial benefit, including from self-dealing.

87.     Defendants' breaches of fiduciary duty caused the Company to falsely advertise and materially misrepresent the scope of critical medical coverage to its customers, incur millions

of dollars in unpaid claims (causing significant harm to its customers and individual plan participants and their families), to accumulate substantial debt well beyond the Company's ability to pay, to create an unsustainable business model, to have heightened legal and compliance risks, and ultimately to collapse.

88.     Defendants acted in bad faith, consciously disregarded their duties to Debtors, and behaved in a manner that was intentional, malicious and egregious.  Defendants knew or should have known of improprieties and other questionable practices but either caused Debtors to engage in them in the first place, encouraged Debtors to continue engaging in them, or utterly failed to stop them.

89.     As a result of the breaches of fiduciary duties by Defendants, Debtors have suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $7.5 million.

## VI.     **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff William A. Homony, Liquidating Trustee for the Arsenal Liquidating Trust, demands judgment in his favor and against Defendants, jointly and severally, for:

(a)     Damages in the excess of $7.5 million;

(b)     Punitive damages in the amount to be determined by the jury;

(c)     Pre-judgment interest, reasonable attorneys' fees, and costs; and

(d)     Such additional relief as this Court deems just.

VII.    <u>JURY DEMAND</u>

The Trustee demands a jury trial before an Article III Judge on all claims asserted in this

Complaint that are triable to a jury under the Constitution and applicable law.


Dated: January 16, 2025                    **CHIPMAN BROWN CICERO & COLE, LLP**
          Wilmington, Delaware

                                            */s/ Alan M. Root*
                                            Alan M. Root (No. 5427)
                                            Hercules Plaza
                                            1313 North Market Street, Suite 5400
                                            Wilmington, Delaware 19801
                                            Telephone:   (302) 295-0191
                                            Email: root@chipmanbrown.com

                                                    and

                                            **COREN & RESS, P.C.**
                                            Steven M. Coren, Esq.
                                            (*pro hac vice* to be requested)
                                            Two Commerce Square
                                            2001 Market Street, Suite 3900
                                            Philadelphia, Pennylvania 19103
                                            Tel: (215) 735-8700
                                            Fax: (215) 735-5170
                                            Email: scoren@kcr-law.com

                                            *Counsel for William A. Homony, in his capacity as Trustee*
                                            *for the Arsenal Liquidating Trust*